## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

AMADEO GOMEZ,

                     Plaintiff,

   vs.

ARCH WOOD PROTECTION, INC., a
LONZA COMPANY, OSMOSE, INC.,
n/k/a KOPPERS PERFORMANCE
CHEMICALS INC., and CHEMICAL
SPECIALTIES, INC., n/k/a VENATOR
MATERIALS PLC,

                     Defendants.

-------------------------------------------------------X

Civil Action No.

**PRODUCTS LIABILITY
COMPLAINT**

**JURY TRIAL DEMANDED**

### COMPLAINT FOR PERSONAL INJURIES

COMES NOW, the Plaintiff, Amadeo Gomez, by counsel, and for his cause of action against the Defendants, Arch Wood Protection, Inc., Osmose, Inc. and Chemical Specialties, Inc., alleges and states:

### I.      NATURE OF THE ACTION

1.     Arsenic is a highly toxic, poisonous, and deadly substance often used as an insecticide or weed killer.

2.     Since 1977, Arch Wood Protection, Inc. (Arch), Osmose, Inc. (Osmose), n/k/a Koppers Performance Chemicals, Inc. (Koppers), and Chemical Specialties, Inc. (CSI), n/k/a Venator Materials PLC (Venator), and their predecessors, manufactured inorganic pentavalent arsenic used in the pesticide to treat wood which also included chromium and copper, known as chromated copper arsenate and the acronym "CCA." The arsenic-based pesticide of the Defendants was used by wood treaters to treat pine wood for residential, commercial, and agricultural uses. It was banned for certain residential uses because of the cancer risk to children, as of December 31,

1

2003. The arsenic manufactured by the Defendants was a fungible product. There were no labels on the CCA treated wood, which described the nature and extent of the health and environmental hazards caused by arsenic.

3.     Arsenic was used as a "rat poison" until the late 20th century.

4.     At all times material to this action, Arch, Osmose, and CSI, working in concert, used deception, concealment, half-truths, and fraud in marketing, promoting, and warranting their inherently dangerous product: pinewood pressure treated with inorganic pentavalent arsenic, chromium and copper.

5.     Arsenic in CCA treated wood is highly toxic on an acute and chronic basis and lethal at minute levels.

6.     Arsenic in CCA treated wood is a known human carcinogen.

7.     Arsenic in CCA treated wood is non-biodegradable in the environment.

8.     Working in concert, the Defendants manufactured the arsenic-based pesticide with its primary purpose to kill termites, and, based on this undisclosed function, Defendants promoted Lifetime and 50-Year warranties.

9.     At all times material to this action, Defendants knew that arsenic is released from pine wood by: (1) leaching, (2) burning, (3) sawing, drilling, and sanding, and (4) as of 1987, transferring from the surface of CCA treated wood playsets to the hands of children, creating a risk of cancer that is analogous to sunlight.

10.     At all times material to this action, Arch, Osmose, and CSI knew there was medical and scientifically valid evidence that exposure to the release of arsenic, chromium, and copper from CCA treated wood was capable of causing health hazards, including but not limited to the following:

1)  Arsenic crosses the blood brain barrier inducing cell injury and cell death ;

2)  Ulcerations, lesions, and infections from injected CCA splinters ;

3)  Respiratory tract, skin, and eye irritation from arsenic toxicity in which arsenic binds to essential proteins within the cell and interferes with metabolic processes leading to cellular malfunction and death ;

4)  Nosebleeds ;

5)  Sinusitis ;

6)  Cancer risk to children ;

7)  Headaches ;

8)  Dizziness ;

9)  Mental confusion ;

10) Skin, lung, nasal, sinus, and bladder cancers ;

11) Toxic encephalopathy ;

12) Immune system sensitization ;

13) Lung damage ;

14) Cacosmia ;

15) Hypersensitivity to environmental triggers ;

16) Porphyria ;

17) Blackouts ;

18) Systemic poisoning ;

19) Hair loss ;

20) Mees' lines ;

21) Garlic odor ;

22) Skin rash ;

23) Paranoia ;

24) Allergic reactions ;

25) Difficulty breathing ;

26) Nausea ;

27) Projectile vomiting ;

28) Loss of appetite ;

29) Drowsiness ;

30) Dilated pupils ;

31) Visual disturbances ;

32) Irregular heartbeat ;

33) Myocarditis ;

34) Lung, liver, kidney, nerve, and eye damage ;

35) Diarrhea ;

36) Stomach and chest pain ;

37) Peripheral neuropathy ;

38) Blood system disorders ;

39) Bronchitis ;

40) Chemical pneumonitis ;

41) Pneumonia ;

42) Hearing loss ;

43) Arsenicalism ;

44) Death ; and

45) Toxic and lethal effects to cats (licking arsenic laden water from the surface of a deck), dogs (chewing salt-treated wood decks), horses (cribbing on salt-treated wood fencing), and cattle (ingesting arsenic laden ash from burned CCA treated wood).

11. Knowing the health hazards caused by CCA treated wood, with reckless indifference for the health and safety of end-users, Arch, Osmose, and CSI, jointly represented on March 25, 2015, that:

> *"In fact, there are no generally recognized*
> *symptoms of exposure to CCA-treated wood."*

12. At all times material to this action, Defendants knew the CCA treated wood was inherently dangerous and uninsurable for personal injury or property damage "loss claims."

13. At all times material to this action, the Defendants knew the "release" of arsenic from treated wood presents an imminent threat of endangerment to human health and the environment.

14. At all times material to this action, knowing there were health and environmental hazards caused by the release of arsenic, Defendants jointly represented to end-users that CCA treated wood is safe when used as recommended. End-users of CCA treated wood, including the Plaintiff, were and continue to be innocent victims of the deception of Arch, Osmose, and CSI.

15.     As a direct and proximate result of the hidden health and environmental hazards of arsenic, end-users, including the Plaintiff, were poisoned.

16.     With willful and reckless indifference for the health and safety of end-users and the environment, Defendants, acting in concert, never affixed any mandatory warning labels on CCA treated wood, as recommended by the U.S. EPA in 1981 and 1984, pursuant to the guidelines of the 1976 Toxic Substances Control Act (TSCA). Defendants knew adequate warning labels about the health and environmental hazards of arsenic would:

> (a) Protect end-users and the environment;
>
> (b) protect the Defendants from liability; and
>
> (c) end the marketing of CCA treated wood.

17.     Working in concert, as of December 31, 2003, Arch, Osmose, and CSI withdrew their registrations with the U.S. EPA for the manufacture of CCA used to treat wood for residential uses including decks and playsets. The withdraw was based on the cancer risk to children and market studies of the Defendants.

## II. DISCOVERY OF CAUSE OF ACTION

18.     The Plaintiff, Amadeo Gomez, had no clue that what he knew only as "pressure treated (PT) wood" to build a two-story tree-fort / playset for his children, and in construction as a carpenter on high-end residential projects, contained arsenic.

19.     Amadeo Gomez is totally disabled and unable to perform his work as a master carpenter. He is married to Maria, with three adult children. Amadeo is 54 years old.

20.     On September 3, 2019, he was preliminarily diagnosed with systemic poisoning caused by arsenic.

## III. PERMANENT WARNING LABEL

21.     All existing CCA treated wood needs a permanent TSCA warning label describing the nature and extent of the health and environmental hazards to children and end-users, caused by arsenic, including proper methods of disposal.

## IV.     PARTIES

22.     The Plaintiff Amadeo Gomez is a resident of White Plains, New York.   The Plaintiff worked on high-end homes for SBE Company as a subcontractor. From 1999 to 2002, he worked in the areas of Greenwich, Cos Cob, Westport, and Fairfield in Connecticut, North Salem, and upper Westchester County in New York. He did punch list items, installation of trim molding and building and installing custom cabinetry. From 2002 to 2003, the Plaintiff was an employee of Spec Personnel, where he handled all high-end carpentry, as well as performing as a leader or team member of a crew. He handled multi-million-dollar projects for Spec Personnel. In late 2003, his contract was purchased by the I Grace Company from Spec Personnel, soon after his exposure started. During this time, he was exposed to arsenic in pressure-treated (PT) wood.  He did not discover that he was exposed to arsenic in PT wood until July 18, 2019, when elevated levels of arsenic were found in his body.

23.     The Defendants are:

(a)  Arch Wood Protection, Inc. ("Arch"), formerly known as Hickson Corporation ("Hickson"), and before that Koppers Company, Inc. ("Koppers"). Arch is the warrantor of the CCA treated wood. Arch is located at 360 Interstate North Parkway #450, Atlanta, GA 30339.


(b) Osmose, Inc. ("Osmose"), formerly known as Osmose Wood Preserving Co. of America, Inc. ("Osmose Wood Preserving"), and now known as Koppers Performance Chemicals, Inc. ("Koppers Performance Chemicals"). Koppers Performance Chemicals is located at 1016 Everee Inn Rd., Griffin, Georgia 30224. Koppers Performance Chemicals is the warrantor for treated wood manufactured with the CCA pesticide of Osmose.

(c) Chemical Specialties, Inc. (CSI), and now known as Venator Materials PLC (Venator).  Venator is located at 5910 Pharr Mill Road, Harrisburg, NC 28075. Venator is the warrantor for treated wood manufactured with the CCA pesticide of CSI.

## IV.   DISCOVERY

24.    Plaintiff experienced the start of systemic health problems in 2003 in which the cause was unknown. As a direct and proximate result of the systemic health problems, he was left unable to fulfill his duties required by his position in high-end carpentry. With the etiology of his symptoms unknown, he took on less taxing carpentry work. On or about September 3, 2019, Plaintiff was preliminarily diagnosed with encephalopathy, fatty liver, chronic sinusitis, cardiomyopathy, and a history of pneumonia, along with other chronic ailments from 2003 to the present day. Plaintiff experienced decreased work abilities due to progressively worsening anxiety and inability to handle interpersonal stress due to exposure to CCA treated wood. Plaintiff suffered several falls due to disorientation and confusion, which resulted in physical injury to his ribs and shoulder. Plaintiff is "at risk" of cancer and ongoing systemic toxic health effects.

25.    As a direct and proximate result of his injuries caused by exposure to arsenic, Plaintiff is unable to be gainfully employed. Plaintiff is 55 years of age.

## VI.  FACTUAL ALLEGATIONS

### A.  Background Information

26.    The chemical at issue, in this case, is arsenic, and specifically, inorganic arsenic in the forms of: (1) pentavalent arsenic and (2) trivalent arsenic.  Inorganic arsenic is distinguished from organic arsenic which is known as "fish arsenic," and is essentially non-toxic.  Inorganic

arsenic does not contain carbon.  The pentavalent arsenic manufactured by the Defendants was used by the wood treaters to treat the pinewood from which the Plaintiff was exposed to the arsenic.

27.     Defendants have known since 1979 that pentavalent arsenic converts to the more toxic form of trivalent arsenic when the wood is burned. In addition, Defendants have known that when using power tools for working, cutting, or shaping, do not labour tool to the point where it over-heats the wood and causes smoke. This smoke can be toxic, especially if it concentrates in a poorly ventilated work area, and a dust mask may not protect you against the ultra-fine particles of the burnt product.

28.     Pentavalent arsenic is known as arsenate. Trivalent arsenic is known as arsenite.

29.     As of 1979, the Defendants knew and have never warned homeowners that a house fire that burns the CCA treated-wood deck, creates health and environmental hazards for which there is no homeowners' liability insurance coverage.

30.     Since January 10, 1986, the Defendants have known that the correct nomenclature for the treated wood is the term used by the U.S. EPA:  Inorganic Arsenical Pressure-Treated Wood, which includes chromated copper arsenate treated wood.

31.     The term "arsenic-treated wood" is accurate, descriptive, and transparent.

32.     At all times material to this action, Defendants knew if they used the term "arsenic treated wood," it would be impossible to market the product.

33.     The term "arsenic-treated wood" was never used by the Defendants in any written publication to describe chromated copper arsenate treated wood.

34.     Arch, Osmose, and CSI used the same American Wood Preservers Association (AWPA) specifications in manufacturing arsenic for the CCA preservative.

**B.  Arch, Osmose, and CSI were the Only Manufacturers of the Fungible Arsenic in the Pesticide for CCA Treated Wood**

35.     At all times material to this action, the Defendants (Arch, Osmose, and CSI) were the sole producers of inorganic pentavalent arsenic used to treat the Southern Yellow Pine.

36.     There were instances where wood treaters purchased arsenic from the Defendants (Arch, Osmose, and CSI) and chromium and copper from other entities.

37.     Arsenic was the only hazardous chemical in the CCA pesticide, which the U.S. EPA required the Defendants to register.

38.     In a joint request, Arch, Osmose, and CSI withdrew their registrations for the arsenic-based pesticides used to treat playsets and other residential uses on March 20, 2002, effective December 31, 2003.

**C.  Arch, Osmose, and CSI used Deceptive Nomenclature**

39.     At all times material to this action, Arch, Osmose and CSI, acting in concert, used deceptive nomenclature, trademarks, and registrations to conceal the hidden hazards of arsenic in "treated wood."  The following terms were used for marketing the product:

(a)  Salt-Treated Wood;

(b)  Wolmanized Wood ® used by Arch;

(c)  Osmose Brand Pressure-Treated Wood ® used by Osmose;

(d)  Greenwood ™ used by CSI;

(e)  Treated Wood;

(f)  Pressure Treated Wood (PT);

(g)  Chromated Copper Arsenate Treated Wood; and

(h)  CCA Treated Wood.

40.     At all times material to this action, Arch, Osmose and CSI, working in concert, never used the term "arsenic-treated wood" for the reason that it would make it impossible to market the product.

41.     Working in concert, each Defendant knew if another Defendant used the terminology, "arsenic treated wood," it would end the marketing of the product.

**D. Arch, Osmose, and CSI Provided Warranties for CCA Treated Wood**

42.     Arch, Osmose, and CSI all promoted warranties for chromated copper arsenate treated wood.

43.     At all times material to this action, Defendants used 50-year and limited lifetime warranties as a "sales tool" to market treated wood with their CCA pesticide.

44.     In concert of action, the known defects of the Southern Yellow Pine such as warping, splitting, twisting, shrinking, and cupping were excluded from the warranties of Arch, Osmose, and CSI.

45.     The Defendants' warranties had unattainable conditions for end-users to enforce its provisions. The 50-year and limited lifetime warranties of Arch, Osmose, and CSI were a sham.

46.     At all times material to this action, as part of a marketing scheme, Arch, Osmose, and CSI concealed that the underlying basis for the warranties is the leaching of arsenic which kills termites and other destructive organisms.

47.     In concert of action, the Defendants knew and concealed that the leaching of arsenic is the same mechanism that makes treated wood inherently dangerous to human health and the environment.

48.     Arch, Osmose, and CSI did not have a method by which purchasers of CCA treated wood received their written warranties, such as a registration form.

**E. Arch, Osmose, and CSI Failed to Inform the Plaintiff about the Hazards of Arsenic in Treated Wood**

49.     At all times material to this action, Arch, Osmose and CSI, working in concert, failed to inform end-users, including the Plaintiff that the arsenic in treated wood:

    (a)  is a proven human carcinogen;

    (b)  transfers from the surface of the playsets to the hands of children creating a risk of cancer;

    (c)  was withdrawn for certain residential uses by Arch, Osmose, and CSI as of December 31, 2003, because of the cancer risk to children;

    (d)  caused toxic effects to individuals from burning CCA treated wood;

    (e)  caused toxic effects to individuals from sawing CCA treated wood;

    (f)  caused lesions ulcerations, and infections from the injection of CCA treated wood splinters;

    (g)  makes CCA treated wood too dangerous to insure in homeowners' policies for personal injury and property damage liability "loss claims";

**F. Defendants Never Informed End-users, including the Plaintiff about the "Information" in Peer-Reviewed Medical and Scientific Articles which Described Health and Environmental Hazards of Arsenic in CCA Treated Wood**

50.     The Defendants never informed end-users, including the Plaintiff, about the health and environmental effects described in Henry A. Peters et al., *Arsenic, Chromium, and Copper Poisoning from Burning Treated Wood*, 308 New Eng.J.Med. 1360 (1983).  This letter to the editor states in part:

    (a) "*To the Editor*:  We wish to report a health hazard that we believe has been overlooked in the past-namely, the burning of wood treated with chromate-copper-arsenate (CCA).  The accumulation of high levels of copper, chromium, and arsenic in the ash and dust in their home is believed to have caused multiple problems in a rural family of eight." (p. 1360)

11

(b) "All family members (of the Mortag family) had symptoms that included conjunctivitis, bronchitis, pneumonia, sensory of the arms and legs, muscle cramps, dermatitis over the arms, legs, and soles of the feet, nosebleeds, ear infections, "blackouts and seizures," gastrointestinal disturbances, and severe alopecia."  (p. 1360)

(c) "We cannot be certain to what extent each of the three elements was responsible for the broad spectrum of signs and symptoms in this family, since all three elements are known to be toxic and synergistic effects are probable."  (p. 1361)

51.     The Defendants never warned end-users, including the Plaintiff, about the health and environmental effects described in Henry A. Peters et al., *Seasonal Arsenic Exposure from Burning Chromium-Copper-Arsenate-Treated-Wood*, 251 JAMA 2393-2396 (1984).  The article states in part:

(a) "All eight members of the family experienced the following health conditions during the last three years when they burned the CCA treated wood: (1) eye irritations, (2) bronchitis, lung congestion, (3) headaches, (4) nosebleeds, (5) alopecia, (6) diarrhea, (7) dermatitis.  Elevated arsenic levels were measured in the hair and fingernails of seven of the eight family members." (p. 2394, Table 1 and Table 2)

52.     The Defendants never warned end-users, including the Plaintiff, about the health and environmental effects described in Henry A. Peters et al., *Hematological, Dermal, Neuropsychological Disease from Burning and Power Sawing Chromium-Copper-Arsenic (CCA)-Treated Wood*, 59 Acta Pharm. Toxical.  39-43, (1986).  The article states in part:

(a) "Signs and symptoms reported by the rural Wisconsin family that had been burning CCA-treated lumber did not appear as acute as the symptoms experienced by these two workers who used electric saws and drills to fashion picnic tables from the freshly treated CCA wood.  Dermatological symptoms with scratching and bleeding of the skin, respiratory symptoms, abdominal colic, loss of hair, muscle cramps, malaise, fatigue, black outs, and feelings of disorientation are similar in both groups and nosebleeds were reported by Wisconsin family and the picnic table workers developed burning sinuses and spontaneous nasal bleeding after breathing CCA-rich sawdust, fluid and air." (pg. 40-41)

(b) Analysis of the hair and fingernails of the female showed levels of 130 parts per million and 1,352 parts per million. Analysis of the hair and fingernails of the male

12

showed 99 parts per million and 402 parts per million.  Normal for hair is 0.65 parts per million; normal for nails is 0.9 to 1.8 parts per million.  Urine levels were normal. (p.41)

53.     The Defendants never warned end-users, including the Plaintiff, about the health and environmental effects described by William J. Baldwin, *Sediment Toxicology Study of CCA-C-Treated Marine Piles*, 90 Proceedings of the American Wood Preservers' Ass'n 300, (1994). The article states in part:

> (a) "In fact, some leaching of copper, chromium, and arsenic ions <u>must</u> occur in order for the treated wood to be toxic to the destructive organisms it is being protective against (Hartford, 1986)." (emphasis added) (p. 300)

54.     The Defendants never warned end-users, including the Plaintiff, about the health and environmental effects described in Hullinger et al., *Bovine Arsenic Toxicosis from Ingestion of Ashed Copper-Chrome-Arsenate Treated Timber*, 40 Vet.Hum.Toxic.147-48 (1998).  This article states in part:

> (a) "Seven cows from a herd of 37 developed diarrhea, weakness, stumbling and prostration. Four of the affected cattle died with a 48-h period."  (p. 147)

> (b) "Timber created with CCA is not considered a likely source of poisoning when used in structures to house animals (8).  However, as this case demonstrates, lumber becomes toxic when burning concentrates arsenic in the ashes and reduces pentavalent arsenic to the more toxic trivalent form (2)."  (p. 148)

55.     The Defendants never warned end-users, including the Plaintiff, about the health and environmental effects described in S.J. Wasson et al., *Emissions of Chromium, Copper, Arsenic, and PCDDs/Fs from Open Burning of CCA-Treated Wood*, 39 Env.Sci.Tech. 8865-76 (2005).  The article states in part that:

> (a) "Aged and weathered chromated copper arsenate (CCA) treated wood was burned in an open burn research facility to characterize the air emissions and residual ash. The objectives were to simulate, to the extent possible, the combustion of such waste wood as might occur in an open field or someone's backyard; to characterize the composition and particle size distribution (PSD) of the emitted fly ash; to

13

determine the partitioning of arsenic, chromium, and copper between the fly ash and residual ash; and to examine the speciation of the CCA elements." (p. 8865)

(b) "These results indicate that the open burning of CCA-treated wood can lead to significant air emissions of the more toxic trivalent form of As [As is the symbol for arsenic] in particle sizes that are most respirable." (p. 8865)

56.     The Defendants never warned end-users, including the Plaintiff, about the health and environmental effects described in F.R. Bertin, et al., *Arsenic Toxicosis in Cattle: Meta-Analysis of 156 Cases. J Vet Intern Med 2016;27:977-981*. This article from the Purdue Department of Veterinary Clinical Sciences states in part:

(a) "Acute arsenic toxicosis is a rare, sporadic condition in cattle. As observed in this study, ashes from treated or painted wood are the most common environmental source, with ingestion of ashes resulting in disease. ... Toxic ranges of arsenic after ingestion in cattle are wide with a lethal dose 50% (LD50) of 1–25 mg/kg for trivalent arsenic and a LD50 of 30–100 mg/kg for pentavalent arsenic." (p.979)

(b) "Clinical signs of acute arsenic toxicosis in cattle are caused by direct inflammation of gastrointestinal mucosa and vasculature, and by damage to organs with high ATP requirements." (p.979).

57.     Arch, Osmose, and CSI knew it would be difficult, if not impossible, to market CCA treated wood with any of the information from the above scientific and medical articles, all of which document health and environmental hazards of arsenic.

## G. Withdraw of Chromated Copper Arsenate Treated Wood for Residential Decks

58.     On February 22, 2002, Arch, Osmose, and CSI jointly requested the U.S. EPA to accept the withdrawal of their wood pesticide products containing chromated copper arsenate for certain residential uses, where children could come into contact with arsenic on the surface of the wood, effective December 31, 2003. On March 17, 2003, the U.S. EPA granted the joint request of the Defendants.

59.    After December 31, 2003, all manufacturing of the chromated copper arsenate pesticide for specified residential uses was terminated by the Defendants, but stockpiles of CCA treated wood could be sold.

60.    Arch, Osmose, and CSI asserted that their "withdraw" was the result of current and projected "market demand" for chromated copper arsenate products and the availability of new generation wood treatment products.

61.    To the contrary, the U.S. EPA affirmed: "that reducing the potential residential exposure (of children) to a known human carcinogen is desirable."  The withdraw affected future residential uses of CCA treated wood, including playground structures, decks, picnic tables, landscaping timbers, residential fencing, patios, walkways, and boardwalks.

62.    After December 31, 2003, Defendants continued the production of CCA treated wood for framing, shakes, shingles, utility poles, pilings, and other uses where children did not come in contact with the arsenic on the surface of the wood in a residential setting with a risk of cancer.

63.    The withdrawal of arsenic-treated wood for residential uses and playground structures on December 31, 2003, should have been implemented by the Defendants in 1987. There was documentation in 1987 that arsenic transfers from the surface of treated wood in playground equipment to the hands of children, creating a risk of cancer. After December 31, 2003, the Defendants never took any corrective action to warn end-users and the Plaintiff about the cancer hazard to children and the latency period from exposure to onset of the disease.

**H. Defendants Knew and Never Informed End-users, including the Plaintiff, that CCA Treated Wood was too Dangerous to Insure for Personal Injury and Property Damage "Loss Claims"**

64.     In March 2003, Defendants knew that because of the health and environmental hazards of arsenic in treated wood, it was "explicitly excluded" in the Commercial General Liability ("CGL") coverage provided by Zurich Insurance.  Defendants knew if chromated copper arsenate treated wood was too dangerous for liability coverage in Zurich's CGL policies, it was likewise too dangerous for liability coverage for CCA treated wood used by end-users. From March 2003 to the present day, the Defendants concealed the uninsurable health and environmental hazards of arsenic from end-users, including the Plaintiff.

**I.   Defendants Knew the Leaching of Arsenic from CCA Treated Wood Mandated Disposal in Protected Lined Landfills or Hazardous Waste Landfills**

65.     For the mutual benefit of the Defendants, the American Wood Preservers Institute (AWPI) obtained a "temporary exemption" from the EPA in 1980 for the disposal of CCA treated wood in a hazardous waste or protected lined landfill. Defendants knew that the leaching of arsenic from treated wood required disposal as a hazardous waste. AWPI obtained the temporary exemption if the CCA treated wood was used for its "intended use," such as a residential deck. Defendants knew that the 1980 temporary exemption was the only way Defendants could market and sell their product without alerting end-users, including the Plaintiff, to the environmental hazards of arsenic.

66.     At all times material to this action, Arch, Osmose, and CSI knew they could not market CCA treated wood if end-users, including the Plaintiff, knew the leaching of arsenic required disposal in a protected landfill. It is axiomatic that if arsenic-treated wood is too hazardous for disposal in an unprotected landfill, it is too dangerous for ownership by an end-user. The perversity is manifest.

**J.   Evidence on the State of Mind of the Defendants to Conceal Known Hazards**

False Declaration

67.     The state of mind of Arch to conceal the "hidden hazard" of arsenic in treated

wood is demonstrated by the sworn Declaration on June 16, 2000, of William Baldwin, Vice

President of Operations and Industry Relations for Hickson (now Arch), that ""Wolmanized"

Pressure-Treated Wood does not contain arsenic." *With the sworn declaration that arsenic is not*

*in treated wood, it is self-evident that Arch never had any intention of warning end-users,*

*including the Plaintiff, about the health and environmental hazards of arsenic.*

68.     Judge Willis B. Hunt Jr. rejected the sworn Declaration of Mr. Baldwin. Judge

Hunt found that: "However, the undisputed facts before the Court demonstrate that Wolmanized

Pressure Treated Wood contains pentavalent arsenic, which is also referred to as arsenic (V). The

warning label attached to Wolmanized Pressure Treated Wood states that "Arsenic is in the

pesticide applied to this wood." *Hickson Corp. v. Northern Crossarm Co., Inc.,* 235 F. Supp. 2d

1352, 1358-1359 (N.D. Ga. 2002).

69.     Acting in concert, Osmose and CSI condoned the false declaration of William

Baldwin by their silence.

Hidden Danger of Arsenic in Splinters

70.     Both Arch and Osmose issued an identical "Health Safety Alert," which stated

"Handling May Cause Splinters."  Arch and Osmose concealed the "hidden danger" of arsenic in

the splinters. The "Health/Safety Alert" is a half-truth. It was fraudulent.

71.     Arch, Osmose, and CSI knew the hidden hazards of ulcerations and lesions caused

by arsenic in treated wood splinters and never warned end-users, including the Plaintiff. If end-

users, including the Plaintiff, knew the health hazards of arsenic in splinters, they would appreciate the dangers of CCA treated wood.

72.     Defendants knew that ordinary splinters are an "open and obvious" danger, which requires no warnings. Defendants knew that a warning about the "hidden danger" of arsenic in a splinter would end the sale of CCA treated wood.

Consumer Safety Information Sheet

73.     In 2001, the Defendants supplied a "Consumer Safety Information Sheet" for CCA treated wood with the precaution:  "Wear gloves when working with the wood."  Arch, Osmose, and CSI concealed the "reasons" for the precaution.  The Defendants knew that gloves were needed to prevent the following hazards: (1) the lesions and ulcerations caused by splinters, and (2) the cancer risk of arsenic, which is dislodged from the deck surface to the hands. Defendants knew marketing their product would be impossible if they described the "reasons" for the precaution to wear gloves.

Safe When Used as Recommended

74.     At all times material to this action, Arch, Osmose and CSI promoted their product as SAFE when used as recommended. At all times material to this action, Defendants knew that all uses of CCA treated wood presented health and environmental hazards for which precautions were necessary. Defendants knew it would be impossible to market treated wood and describe the known hazards of arsenic.

**K.  Deception and Duplicity Underlie Decades of Defendants' Acts and Omissions**

75.     On July 25, 1977, Koppers Company (now Arch), in interoffice correspondence, documented three past instances of "CCA dust toxicity" in 1968, January 1977, and July 1977. In August 1977, the Defendants knowingly or with reckless disregard for the truth, falsely represented

to the EPA that: *"Inorganic pentavalent arsenical compounds of varying formulation have been used as wood preservatives in substantial quantities for more than 35 years with <u>no reports</u> of adverse effects."* (emphasis added).  The false representation was never clarified.

76.     At all times material to this action, Arch, Osmose and CSI knew arsenic was released from treated wood by: (1) leaching, including splinters, (2) sawing and sanding, and (3) burning.  At all times material to this action, Arch, Osmose and CSI knew and failed to inform end-users, including the Plaintiff that:

(a)  Some leaching of copper, chromium, and arsenic ions <u>must</u> occur in order for the treated wood to be toxic to the destructive organisms it is protective against;

(b)  arsenic transfers from the surface of treated wood playsets and tree forts to the hands of children creating a cancer risk;

(c)  arsenic in treated wood fails the EPA's Toxicity Characteristic Leaching Procedure test, requiring disposal in a hazardous waste or protected lined landfill;

(d)  arsenic is released from treated wood by sawing, sanding, and drilling, and the release is exacerbated by dull blades and drills which can burn the wood and cause the release of arsenic laden smoke; and

(e)  as of 2001, the use of bleaches, deck cleaners, or brighteners that contain sodium percarbonate, oxalic acid, or citric acid is not recommended as they may release toxic chemicals from CCA-treated wood and convert the trivalent chromium to the more toxic form of hexavalent chromium in old treated wood decks.

77.     Circa 1980, in describing its "market share", Koppers represented that:

> "The fact that over 50% of all salt-treated wood
> in use today carried the Wolmanized trademark
> verifies its outstanding popularity."(Publication
> Identification W-650)

78.     The Defendants knew that the term "salt-treated wood" had nothing, whatsoever, to do with "table salt" and was calculated to deceive.  Defendants knew that end-users would be misled by the term "salt," thinking it was table salt.  Defendants' use of the phrase "salt-treated wood" refers disingenuously to the salt "form" of the chemicals.

79.     The term "salt-treated wood" is a half-truth. It was the "word-stock" of the Defendants in marketing their product and reflected the "state of mind" of the Defendants to knowingly conceal and never warn about the "highly toxic, poisonous and deadly" nature of arsenic. The Defendants knew a clarification of the half-truth for the benefits of end-users, including the Plaintiff, would end the marketing of their product. The term salt-treated wood replicated the admonition of Sir Walter Scott in 1808: *"Oh what a tangled web we weave, when at first we practice to deceive."*

80.     At all times material to this action, the Defendants promoted treated wood as "Safe." End-users, including the Plaintiff, who knew the product only as pressure-treated (PT) wood, had no reason to even suspect that there were hazards with either owning or performing carpentry work with the wood.

81.     After exhaustive scientific studies, the United States Environmental Protection Agency published notices in Position Document 2-3 (1981) and Position Document 4 (1984) to require mandatory warning labels for arsenic-treated wood, pursuant to the Toxic Substances Control Act (TSCA). From 1981 to 1985, the Defendants spent millions of dollars opposing EPA's mandatory warning labels.

**L.  Working in Concert, Defendants Opposed EPA's Mandatory Warning Labels**

82.     On behalf of the Defendants, on June 10, 1981, legal counsel for AWPI submitted its June 9, 1981, opposition to EPA's proposal for mandatory warnings pursuant to the Toxic

Substances Control Act (TSCA) for chromated copper arsenate treated wood. TSCA Section 6(a)(3) provides that the EPA can require that products "be marketed with or accompanied by clear and adequate warnings and instructions with respect to its use, distribution in commerce, or disposal or with respect to any combination of these activities."

83.     The June 9, 1981 opposition of AWPI contained avowals of safety for the treated wood and disregarded known health and environmental hazards:

(a)     There is no need for a federally required warning to wear gloves impervious to the wood preservatives;

(b)     CCA treated wood has been air or kiln-dried;

(c)     Handling treated wood is not hazardous;

(d)     Dermal exposure to arsenic from treated wood is not associated with skin cancer;

(e)     The risk of adverse health effects to end-users from machining and handling treated wood is virtually non-existent;

(f)     CCA treated wood poses no health threats in terms of oncogenicity, mutagenicity, fetotoxicity, or teratogenicity;

(g)     There is no evidence of a need to protect domestic animals or livestock from such negligible arsenic exposure from treated wood;

(h)     There is no evidence of any significant adverse effects resulting from burning treated wood;

(i)     Actual proof of injury after four decades of inorganic arsenical treated wood use is almost non-existent;

(j)     Some of EPA's recommendations (e.g., wear gloves and disposable coveralls) are supported only by esthetic considerations (i.e., keep hands and clothes clean);

(k)     EPA's recommendations to wear a dust mask while sawing treated wood applies to all wood, not just treated wood;

(l)     OSHA concluded that precautions for sawing treated wood with inorganic arsenicals were not necessary because arsenic is fixed in the wood;

(m)    Because of the smoke and smell, treated wood only rarely would be used as firewood- the problem aimed at by EPA's warning on burning is an esthetic rather than a health issue;

(n)     EPA's proposed TSCA warning rule will be very costly in terms of distribution costs and expensive to enforce;

(o)     EPA's precautions with respect to protective clothing and gloves take no account of improved technology in producing clean surface-treated wood; and

(p)     The EPA made an erroneous finding that treated wood, presents or will present an unreasonable risk of injury to health or the environment and invites unwarranted liability suits.

84.     The opposition of AWPI was deceptive, duplicitous, and in instances, ludicrous. The Defendants never took any corrective action to amend the unwarranted assertions.

## M.  1981 Letter Writing Campaign of Defendants

85.      In concert of action, Arch, Osmose, and CSI jointly initiated a massive letter-writing campaign to Representatives in Congress. The campaign was calculated to dissuade the

EPA from requiring mandatory TSCA warnings for the hazards of CCA treated wood. In a letter to Senator Jesse Helms, dated September 18, 1981, Defendants informed Senator Helms that the "labeling of wood products under the Toxic Substances Control Act," would be "devastating" to the wood treating industry. In support, Defendants informed Senator Helms that: *"The human body needs a certain amount of arsenic to survive."* Following the letter, representatives of the Defendants met with Senator Helms in his office. Defendants knew they could not market CCA treated wood with a mandatory warning label. Defendants prevailed in 1985. There were never any mandatory TSCA warning labels. Innocent end-users, including the Plaintiff, were the victims of the Defendants' mendacious acts and omissions, which spanned four years and cost millions of dollars.

### N. As of 1984, Defendants Privately Acknowledged that Direct Warnings to End-Users were Necessary to Prevent Hazards caused by Arsenic in Treated Wood

86.    Osmose memorialized in writing on June 29, 1984, that all eight members of a family in Wisconsin had "observable long-term toxic effects" from the exposure of arsenic in the ash from burning scraps of CCA treated wood in their woodstove.

87.    Osmose also memorialized in writing on June 29, 1984, that two individuals machining "freshly treated" CCA treated wood without personal protection equipment or mechanical ventilation had "observable toxic health effects" and during a period of non-exposure, "toxic effects were again observed."   Vice President Gerald Daugherty of Osmose Wood Preserving Company, in shifting blame/liability to the wood treater, summarized:

> However, it is important to note that possibly all three of the described incidents could have been avoided if the <u>proper information</u> had been made available to the industrial users and consumers of CCA treated wood. (emphasis added).

Mr. Daughtery concluded:

> In any event, if Osmose® Brand Pressure Treated Wood is shown to be involved, information made available to you [wood treater] and intended for distribution to industrial and consumer users may have avoided the incidents and the litigation. (emphasis added).

Beginning in 1981, Arch, Osmose, and CSI opposed EPA's mandatory warnings, and blamed wood treaters for not providing the "proper information." The perversity is manifest.

88.    With a pattern of callous indifference for the health and welfare of end-users, the Defendants took no corrective action and continued to oppose EPA's mandatory warning labels.

89.    Arch, Osmose, and CSI knew the EPA's 1981 and 1984 mandatory warning labels would:

  (a)  protect end-users and homeowners;
  (b)  protect the Defendants from liability for personal injury and property damage "loss claims"; and
  (c)  end the marketing of chromated copper arsenate treated wood.

90.    At all times material to this action, the Defendants never warned end-users, including the Plaintiff, about the nature and extent of the health and environmental hazards of arsenic.

91.    Defendants and their progeny are estopped by past representations of "safety" from now warning about the "hazards." Warning about the hazards would be tantamount to an admission of liability in the past by the Defendants.

### VII.    IN THE MATTER OF CHAPMAN CHEMICAL CO., ET AL.

92.    In 1985, the Defendants, Koppers Company, Inc., Chemical Specialties, Inc., and Osmose Wood Preserving Company of America, Inc., were Petitioners before the U.S. EPA in an administrative action. Petitioners were represented by counsel before Administrative Law Judge Spencer T. Nissen. The Defendants opposed EPA's authority to require labeling of chromated

copper arsenate treated wood. The Defendants succeeded. On June 11, 1985, Judge Nissen ruled in their favor and stated in a summary of decision:

> The Consumer Awareness Program insofar as it requires labeling of pressure-treated wood, which is not a pesticide, is not authorized by FIFRA and may not be required as a condition of the registration of the pesticide at issue.

93.     At all times material to this action, Defendants knew the EPA had the authority to require labeling of CCA treated wood pursuant to the Toxic Substances Control Act, effective October 11, 1976. Defendants knew they could not market CCA treated wood with mandatory warnings. End-users and families were innocent victims.

## VIII.   MARKET SHARE LIABILITY

94.     Plaintiffs incorporate by reference paragraphs 1 through 93 above.

95.     Working in concert, with 100% of the "market share," Arch, Osmose, and CSI, as the sole manufacturers of the arsenic in the CCA pesticide, for the mutual benefit of the three entities, concealed the known hazards of arsenic in order to market and profit by the sale.

96.     As a direct result of the joint acts and omissions of the Defendants from 1977 to the present day, it is impossible for the Plaintiffs to identify which Defendant manufactured the fungible arsenic in the pesticide used in the CCA treated wood to build their deck.

97.     Working in concert for their mutual benefit, the Defendants used deception, concealment, and half-truths to market CCA treated wood.

98.     Working in concert, the Defendants knew they could not describe the nature and extent of the health and environmental hazards caused by the release of arsenic from CCA treated wood and market the product.

99.     Each of the Defendants is liable for the personal injuries suffered by Amadeo caused by the CCA treated wood based on the impossibility of showing which Defendant manufactured the arsenic.

## IX.     FIRST CLAIM-- PRODUCT LIABILITY

100.     Plaintiff incorporates each and every allegation contained in each prior Paragraph as if set forth in full herein.

101.     The CCA treated wood was defective and unreasonably dangerous in the following manner:

  a. Defendants failed to give reasonable warnings about the nature and extent of the hazards of exposure to CCA on and in CCA treated wood;

  b. Defendants failed to give reasonably complete instructions on the proper use of the product;

  c. As of 1993, the Defendants failed to replace the CCA preservative with a safer preservative that did not contain arsenic and chromium;

102.     As a direct and proximate result of Defendants' defective and unreasonably dangerous product, Mr. Gomez was poisoned by the arsenic, chromium, and copper on and in CCA treated wood.

## X.   SECOND CLAIM-- NEGLIGENCE

103.     Plaintiff incorporates each and every allegation contained in each prior Paragraph as if set forth in full herein.

104.     Defendants acts aforestated constitute negligence which caused the Plaintiff's injuries herein.

## XI.    THIRD CLAIM-- FRAUD

105.    Plaintiff incorporates each and every allegation contained in each prior Paragraph as if set forth in full herein.

106.    Defendants as aforestated made false representation and made material omissions as to the danger of their product(s) which Plaintiff relied upon to his detriment.

107.    As a result thereof, Plaintiff has been injured and seeks compensatory and punitive damages herein.

### PRAYER FOR RELIEF

WHEREFORE, Amadeo Gomez prays for judgment against Arch Wood Protection, Inc., a Lonza Company; Osmose, Inc., n/k/a Koppers Performance Chemicals, Inc.; and Chemical Specialties, Inc., n/k/a Venator Materials PLC, for damages including:

1.    Adverse health effects caused by Mr. Gomes's exposure to the CCA on and in CCA treated wood;

2.    Past, present, and future:

    a.   Medical expenses;

    b.   Lost income and earning capacity, and physical pain and mental suffering suffered by Mr. Gomez

3.    Periodic examinations to detect skin cancer and internal cancers; and

4.    All other just and proper relief in the premises, including punitive damages based on the underlying deception, concealment, half-truths, and fraud

DATED this 2nd day of July 2020.

By: _____

Gary Graifman (Attorney #1704410)
Kantrowitz, Goldhamer & Graifman

747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Phone: (845) 356-2570
Email: ggraifman@kgglaw.com

David S. McCrea (Attorney # 946053)
McCrea & McCrea
119 South Walnut Street
P.O. Box 1310
Bloomington, Indiana 47402-1310
Phone: (812) 336-4840
Email: davidsmccrea@gmail.com

Patrick W. Pendley (Bar Roll # 10421)
Pendley, Baudin & Coffin
24110 Eden Street
Plaquemine, Louisiana 70765
Phone: (225) 687-6396
Email: pwpendley@pbclawfirm.com

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff demands that this action be tried to a jury.

DATED this 2nd day of July 2020.

By: _____

Gary Graifman (Attorney #1704410)
Kantrowitz, Goldhamer & Graifman
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Phone: (845) 356-2570
Email: ggraifman@kgglaw.com